IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| SHERYL ZOLLNER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 04-cv-0225-MJR |
| | ) | |
| KAREN LONG and | ) | |
| ROBERT EASTER, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM and ORDER**

**REAGAN, District Judge:**

Now before the Court is Defendants Karen Long and Robert Easter's motion for summary judgment (Doc. 14) and memorandum in support (Doc. 17) as to Count One of Plaintiff Sheryl Zollner's complaint against Long and Easter. Zollner alleges Long and Easter violated **42 U.S.C. 1983** by retaliating against her for exercising her First Amendment rights (Doc. 1).[1] Zollner responded in opposition at Doc. 18, to which Long and Easter replied at Doc. 19. This matter being fully briefed, the Court begins its analysis with a brief recitation of the factual background and procedural history.

**Factual Background and Procedural History**

Zollner was employed by the University of Illinois at their Cooperative Extension Service office in Sparta, Illinois from 1982 until June 21, 2002, when she resigned. Long was

---

[1] Zollner originally filed a two-count complaint against Defendants. However, in the Court's March 25, 2005 Order, the Court dismissed Count Two in its entirety (Doc. 20).

Zollner's supervisor from the date Long was hired in 1983 or 1984 until Zollner resigned in 2002. Easter was Long's supervisor and responsible for the University of Illinois Extension Program, which included the office where Zollner worked.  Zollner initially worked at the office as a secretary.  She then assumed the position of Community Worker in 1993.  As a Community Worker Zollner was responsible for 4-H programming and Homemaker's Extension Association programming in Randolph County, Illinois.  Then in March 1998, Zollner voluntarily resumed the position of office secretary as she believed her Community Worker position was going to be eliminated.  However, Zollner returned to the Community Worker position in August 1999, and continued in that position until her resignation on June 21, 2002, which was formally accepted on June 22, 2002.  Zollner states she returned to the Community Worker position as she witnessed "some things as [secretary] that I felt were unethical, unprofessional." Doc. 24, Exh. B-Part I, p. 17.

Zollner first witnessed alleged unethical behavior in the summer of 1998 when working as the office secretary .  Long approached Zollner and asked if she would be willing to do some typing for Steve Keith of Alltech Research, who owned several greenhouses.  Long told Zollner that in addition to her work at the office, she does business with Keith.  Zollner told Long she would do the work on her off-time at home.  Zollner ended up typing and designing three brochures at Long's request for Keith on her off-hours.  However, Long instructed Zollner to run the brochures on the office copier and fold them while she was at work.  Long paid her for her the time she worked at home on the brochures.

As well, Long later instructed Zollner to make a guide outlining various types of weeds using University publication materials, apparently for Keith, while at the office.  Zollner did so, and later that summer a huge shipment of copies of the weed guide Zollner had made arrived at

the office. Zollner is unsure whether the University material on weeds was copyrighted. Long also had Zollner bind materials for Keith and Alltech.

In the fall of 1998, Zollner was in charge of paying the office staff's work cell phone bills. Zollner noticed that Long's bill had tripled, and upon looking at the itemizations, Zollner noticed that most of the calls were to Keith's business. As well, Zollner observed Keith coming into the office on a daily basis and meeting with Long for a couple of hours behind closed doors. Keith would also constantly call Long at the office. Further, Zollner observed Long ordering office supplies for Keith using the University's tax exempt status and educational discount. However, Long would keep the bill separate from office bills and Keith would pay his portion.

Zollner had a conversation with Long where she told her she did not think it was right that Keith was ordering supplies through the office and that it was a conflict of interest for Long to be working for Keith. Zollner also mentioned Long's cell phone bills and how Keith was always calling her and coming by to see her at the office. Zollner states that Long simply replied that she did not realize that Keith was ordering supplies with the office's tax exempt and educational discount status. She also apologized for people's concern about her conflict of interest. Thereafter, Keith stopped coming by the office, but instead, Long would take two and three hour lunches, and Zollner believes she was meeting with Keith during that time. Long's cell phone usage did not decrease.

Zollner then resumed the position of Community Worker and Jennifer Jacobsen took over her former position as office secretary. At some point Jacobsen approached Zollner and asked if Long was working for somebody else. Zollner informed Jacobsen that Long was working for Keith and Alltech Research. At that point Jacobsen shared with Zollner that office equipment was

3

being checked out by either Long or Keith and it would be gone for extended periods of time. As well, Jacobsen told Zollner that the office was paying for a subscription for Keith to an internet agriculture database, and Keith was not reimbursing the office.

In January 2000, the University conducted an investigative audit of the Extension Office. Zollner states that Tony Spurlock, the auditor, and Pat Buchanan, the regional director, told Zollner that they were investigating Long because of an anonymous letter they had received. Zollner did not send the letter, nor does she know who sent it. As part of the audit, Zollner gave statements regarding her observations of Long's involvement with Alltech Research. Zollner states that she never learned the results of the January 2000 audit, but that the atmosphere in the Extension Office became hostile and communication between the office staff deteriorated after the audits.[2]

Zollner states that Long told her that she blamed Jacobsen for the audit. As a result, Zollner asserts that Long began to harass Jacobsen by using a harsh tone of voice and by giving her short deadlines on work assignments.

In June 2000, Jacobsen, Zollner, Long, and Buchanan met regarding the audit. Apparently the audit report had just been completed, but the results were only going to be shared with a few people at the University and with Long. Consequently, Zollner and Jacobsen did not learn the results of the audit at the meeting. But Zollner did discuss her feelings regarding Long's conflict of interest and the atmosphere in the office. Jacobsen discussed how she felt that Long was harassing her as a result of the first audit. Jacobsen later resigned on October 30, 2000.

After the June 2000 meeting, Long had a private line installed in her office. Long

---

[2] Zollner does not argue that this initial investigative audit precipitated Long's retaliatory actions giving rise to this suit, but rather the alleged hostile and harassing actions began after a second investigative audit where Zollner complained about Long's misconduct.

told the staff that calls from her family and all direct calls would be made to the new private line instead of to the main line that the secretary answered. If Long did not answer her private line then it would ring out front in the reception area. However, all of Long's family calls and other business calls continued to come through the main line, and whenever Zollner would answer Long's private line, the person would hang up.

A follow-up audit occurred approximately one year after the initial investigative audit. At the audit, Zollner disclosed her concerns regarding Long's work for Keith and Alltech. Zollner also expressed her concerns regarding Long's new private line and Long's extended absences from the office. The auditors also questioned Zollner regarding the office work atmosphere.[3]

After the investigative audit, Zollner claims Long started harassing her, initially by insisting that Zollner get pre-approval from Long before taking sick leave. Then in March 2001, Pat Buchanan, the regional director, instructed Zollner to start emailing her calendar to Buchanan at the beginning of each week, and then email a report of how she actually spent her time at the end of each week. Buchanan would also approve her overtime or comp time. Prior to March 2001, Zollner would prepare monthly reports accounting for her time for Long. Then in April 2001, Zollner's reporting patterns where changed again when Long instructed Zollner that she would approve Zollner's calendar by email at the beginning of each week and adjust it so that no overtime would accrue. Zollner was confused as overtime and comp time was never a problem before and were not for other Community Workers. Long also told Zollner that they would meet to discuss any

---

[3] It is after this second follow-up audit that Zollner alleges Long's harassment towards her began.

adjustments Long wanted Zollner to make so that Zollner would not have any overtime or comp time. However, Long would not consistently meet with Zollner to go over her schedule. Long also instructed Zollner not to answer the office phone when the secretary stepped aware from her station.

In May 2001, Zollner was told by Long that she would no longer be working with the 4-H softball committee. Later on May 22, 2001, Long told Zollner to avoid taking work-related phone calls at home after working hours in order to avoid accruing overtime pay, as it had to be pre-approved. Additionally, Long told Zollner her reporting patterns would again change. Zollner was to now write two additional monthly reports in addition to a monthly success story. Zollner was also to meet with Long at the beginning of each month to review the reports and to discuss if Zollner was meeting her job expectations. However, Long only met once with Zollner.

Zollner alleges she was ostracized during a June 2001 meeting with Dan Nelson, the new regional director, when Nelson told Zollner that the office must operate as a team, and that if they could not work as a team, they would need to seek other employment. As well, in June 2001, Long changed Zollner's job title from Community Worker, Youth and Family, to Community Worker, Youth and 4-H. As a result, Zollner was no longer working with the Homemaker's Extension Association. Additionally, she was now required to attend 4-H club meetings in the evening. However, Zollner was still not to accrue overtime or comp time. Thereafter, on July 16, 2001, Zollner received her evaluation from Long, which was not as high as it had been in the past.

On August 1, 2001, Long informed Zollner that her University cell phone contract would not be renewed, when other employees' contracts were being renewed. That same month, Zollner's office was moved into a meeting room. Prior to that she had her own office, as did all the employees other than the secretary who sat in the front reception area. Long then moved into

6

Zollner's office and Long's old office remained empty. Zollner expressed dissatisfaction with the move to Long and also contacted Nelson. Zollner did retain all of her supplies and equipment that she had in her prior office, but was now in the meeting room where partitions were put up to form a cubicle around her desk, resulting in a smaller office space. On August 28, 2001, Long informed Zollner that her new office in the meeting room would not be painted. Long also failed to order a nameplate for the door of her new office.

On October 1, 2001, Zollner was offended when Long distributed the following quote to the entire office staff: "Great minds discuss ideas. Average minds discuss events. Small minds discuss people." Thereafter, on October 5, 2001, after reviewing Zollner's schedule, Long insisted that Zollner work the afternoon of October 12, 2001 instead of in the morning.

On October 17, 2001, Long refused to give Zollner a copy of Long's schedule so that Zollner could contact Long whenever necessary to seek approval for certain tasks, and instead insisted that the two now meet weekly to discuss approval of Zollner's tasks. Then on November 29, 2001, Long put a note in Zollner's personnel file regarding inappropriate reporting of sick leave, but did not tell Zollner that she reported her sick leave inappropriately. Zollner states that Long would not give her written confirmation that her sick leave and vacation days had been approved.

On December 5, 2001, Zollner asked Long to approve overtime, but Long would only approve a half hour of the time requested to attend a 4-H meeting. Later on December 20, 2001, Long told Zollner that she had taken sick leave on December 10, 2001 without the required preapproval, when Zollner states that Long had actually pre-approved the leave.

Zollner reviewed her personnel file during a January 2, 2002 meeting with University administrator Bill McNamara and Nelson. At the meeting, Zollner learned that Long had placed

several unfavorable notes in her personnel file. As a result, on January 18, 2002, Zollner requested that a number of items be removed from her personnel file stating they contained inaccurate information, and also requested that a number of explanatory documents relating to Long's negative evaluations be added to the file. Long refused to remove documents from Zollner's personnel file but did agree to append the file with information provided by Zollner. Additionally, Zollner filed an official grievance which was denied. Zollner also wrote a letter to McNamara stating that she was being unfairly disciplined because Long informed her that she must restrict her lunch to between noon and 1 p.m. unless otherwise approved, in addition to obtaining prior approval to leave the office to run errands.

In May 2002, Long gave Zollner a negative evaluation. Then on May 23, 2002, Long refused to approve a modification of Zollner's work schedule that would result in overtime. Zollner also reviewed her personnel file where she discovered Long had added additional negative remarks. Zollner then resigned in June 2002 as a result of all the alleged harassment.

On April 5, 2004, Zollner filed this matter against Long and Easter, in both their official and individual capacities. Count One asserted a Section 1983 action against Long and Easter. Count Two asserted a state law retaliatory discharge claim against Long and Easter. Long and Easter then filed a motion to dismiss claiming: (1) the suit is barred by the Illinois Savings Statute; (2) Zollner cannot sue state employees in their official capacities; and (3) a retaliatory discharge case cannot be brought against anyone other than the employer (Doc. 5). The Court granted the motion to dismiss in that the Court dismissed Count One as to Long and Eater in their "Official Capacity", but denied the motion to the extent Long and Easter were sued in their "Individual Capacity" (Doc. 20). As well, the Court dismissed Count Two in its entirety.

**Standard Governing Summary Judgment**

Summary judgment is proper if the pleadings, depositions, interrogatory answers, admissions, and affidavits reveal that there is no genuine issue as to any material fact *and* that the moving party is entitled to judgment as a matter of law.  ***Vukadinovich v. Board of School Trustees of North Newton School Corp.*, 278 F.3d 693, 698 (7th Cir. 2002).**  The Court is to view the record "in the light most favorable to the non-moving party." ***Dyrek v. Garvey,* 334 F.3d 590 (7th Cir 2003),** *citing* **FEDERAL RULE OF CIVIL PROCEDURE 56(c).**

The mere existence of an alleged factual dispute is not sufficient to defeat a summary judgment motion.  ***Anderson v. Liberty Lobby*, 477 U.S. 242, 247 (1986);** *Salvadori v. Franklin School District,* **293 F.3d 989, 996 (7th Cir. 2002).**  Rather, to successfully oppose summary judgment, the nonmovant must present definite, competent evidence in rebuttal.  ***Salvadori,* 293 F.3d at 996,** *citing Vukadinovich***, 278 F.3d at 699.**

**Analysis**

In Count One Zollner brings a claim for retaliatory discharge for exercising her First Amendment free speech rights pursuant to Section 1983 against Long and Easter in their individual capacities.  In response, Long and Easter argue that summary judgment should be awarded in their favor as: (1) Zollner does not allege sufficient adverse actions to state a Section 1983 First Amendment retaliation claim; (2) Zollner's claim against Easter fails as Easter did not participate in the alleged harassment, retaliation or blackballing that allegedly caused Zollner to resign her position; and (3) Zollner's claim against Long fails as Zollner cannot establish that the statements she made to University auditors was a substantial or motivating factor in Long's alleged retaliatory actions against her.  The Court will address each argument in turn.

**1. Whether Zollner alleges sufficient adverse actions to state a Section 1983 First Amendment retaliation claim.**

Long and Easter argue that Zollner does not allege sufficient adverse actions to state a Section 1983 First Amendment retaliation claim based on adverse employment actions. The Court disagrees.

A Section 1983 case does not require an adverse employment action within the meaning of the antidiscrimination statutes, such as Title VII of the Civil Rights Act of 1964. *See Power v. Summers*, **226 F.3d 815, 820 (7th Cir. 2000).** The degree of adversity required in First Amendment retaliation claims brought under Section1983 is substantially lower. ***Bart v. Telford*, 677 F.2d 622, 624 (7th Cir. 1982).** Rather, "[a]ny deprivation ... that is likely to deter the exercise of free speech ... is actionable." ***Power*, 226 F.3d at 820.** In *Bart*, the United States Court of Appeals for the Seventh Circuit held that a campaign of "petty harassment", including ridicule for bringing in a cake to celebrate another co-worker's birthday, in response to views expressed during a political campaign was actionable under Section 1983 as a violation of the First Amendment. *Id.*

The Seventh Circuit reaffirmed that holding seven years later in ***Pieczynski v. Duffy*, 875 F.2d 1331, 1333 (7th Cir.1989)**, explaining that: "Harassment of a public employee ... violates the First Amendment unless the harassment is so trivial that a person of ordinary firmness would not be deterred from holding or expressing those beliefs. The harassment need not be so severe as to amount to constructive discharge – that is, it need not force the employee to quit, by making work unbearable." *Cf. McDonnell v. Cisneros*, **84 F.3d 256 (7th Cir. 1996).** Moreover, the Seventh Circuit has repeatedly held that whether or not harassment is sufficiently severe to give rise to liability under Section 1983 is a question of fact for a jury to decide. ***Wallace v. Benware*, 67 F.3d 655 (7th Cir. 1995);** *Bart*, **677 F.2d at 625.**

As a result, the Court finds, consistent with *Wallace* and *Burt*, that a question of fact exists as to whether or not the harassment alleged here is sufficiently sever to give rise to liability under Section 1983. Zollner alleges a series of actions by Long that Zollner categorizes as harassing. Zollner states that prior to her complaints about Long in the second audit, Zollner did not have to have her schedule pre-approved. Additionally, Long informed Zollner she was not longer able to accrue overtime or comp time even though other workers in the same position throughout the state were still allowed to accrue both. As well, Zollner states that Long would refuse to meet with her to approve her calendar, leaving Zollner in a difficult position to know if she was allowed to attend certain meetings or not. Further, Zollner states that in the spring and summer of 2001, Long moved Zollner from her office into a cubicle while an office sat vacant. Zollner also alleges that after her complaints regarding Long, Long required that Zollner get pre-approval for sick leave. It is not for the Court to decide if these actions in total amount to sufficiently severe harassment to give rise to liability under Section 1983 – that is for a jury to decide.

**2. Whether Zollner has a sufficient Section 1983 First Amendment retaliation claim against Easter.**

Long and Easter argue that Zollner's claim against Easter must fail as Easter did not participate in the alleged harassment, retaliation or blackballing that caused Zollner to resign her position. The Court notes that Zollner does not address this argument in her response in opposition to Long and Easter's motion for summary judgment. The Court agrees with Long and Easter.

To recover damages under Section 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right. ***Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1248 (7th Cir. 1994).** Of course, Easter cannot be personally liable under a theory of respondeat superior. ***Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988).** However,

11

"'[a]n official satisfies the personal responsibility requirement of section 1983 ... if the conduct causing the constitutional deprivation occurs at [his] direction or with [his] knowledge and consent.'" ***Smith v. Rowe*, 761 F.2d 360, 369 (7th Cir.1985),** *citing* ***Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982).** That is, he "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye...." ***Jones*, 856 F.2d at 992.** Supervisors who are "merely negligent in failing to detect and prevent subordinates' misconduct are not liable, because negligence is no longer culpable under Section 1983." ***Jones*, 856 F.2d at 992.** In short, some causal connection or affirmative link between the action complained about and the official sued is necessary for Section 1983 recovery. ***Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983).**

In the case at bar, the only allegation Zollner makes as to Easter is in her complaint where she states that she "reported this retaliation/harassment to Karen Long's supervisors, particularly, Robert Easter, but to no avail." Doc. 1, page 2. However, Zollner later states in her deposition that she does not know Easter's title, she never met him, she has never talked to him, nor has she ever received a letter or e-mail from him. Doc. 24, Exh. B-Part III, p. 113-114. Additionally, Easter, in an affidavit submitted to the Court, states that he has no recollection of having ever met Zollner or ever observing or supervising her work. Doc. 24, Exh. C, p. 1. Easter also states that he has never personally participated in, caused or acquiesced to any employment decision or action directed at Zollner. Doc. 24, Exh. C, p. 1-2. Further, Easter states that he has never personally received a complaint or grievance of any kind from Zollner regarding the terms or conditions of her employment, nor did Easter participate in the evaluation of any such complaint or grievance. Doc. 24, Exh. C, p. 2.

The record before the Court reveals no genuine issue of material fact as to whether

or not Easter was personally responsible for Zollner's alleged deprivation of a constitutional right. Zollner has not presented definite, competent evidence in rebuttal to Long and Easter's evidence that Easter was not involved in, directed, knew or consented to the retaliatory conduct at issue herein. *Cf. Salvadori,* **293 F.3d at 996.** Accordingly, the Court grants summary judgment in Easter's favor as to Count One.

**3. Whether Zollner has a sufficient Section 1983 First Amendment retaliation claim against Long.**

Long and Easter argue that Zollner cannot establish that the statements Zollner made to University auditors was a "substantial or motivating factor" in Long's alleged retaliatory actions against Zollner. To establish First Amendment retaliation, a plaintiff must establish that (1) the speech in question is constitutionally protected, and (2) that it was a substantial, or motivating, factor in the employer's retaliatory actions. ***Brooks v. University of Wisc. Bd. of Regents*, -- F.3d ----, 2005 WL 1023025 (7th Cir. 2005);** *E.g., Carreon v. Ill. Dep't of Human Servs.***, 395 F.3d 786, 791 (7th Cir. 2005).** If the plaintiff establishes these elements, the burden shifts to the government to prove that it would have taken the same action in the absence of the protected speech. *Id.*

As Long and Easter do not challenge whether Zollner's speech is constitutionally protected, we turn to the second element: whether Zollner's complaints were a substantial or motivating factor in Long's alleged retaliatory actions.[4] Zollner claims it is her complaints made

---

[4] The Court notes that the Seventh Circuit has stated that "[s]peech that accurately exposes official impropriety or corruption ... has generally been accorded the highest level of First Amendment protection." *McGreal v. Ostrov*, **368 F.3d 657, 679-680 (7th Cir. 2004).** *See Kinney v. Weaver*, **301 F.3d 253, 276 (7th Cir. 2002)(speech regarding the misconduct of public officials ... is of utmost First Amendment significance);** *Myers v. Hasara*, **226 F.3d 821, 826 (7th Cir. 2000)(noting importance of public employees' right to "expose misdeeds and illegality in their departments");** *Glass v. Dachel*, **2 F.3d 733, 741 (7th Cir. 1993)("matters of public concern do include speech aimed at uncovering wrongdoing or breaches of public trust").** Further, "[w]hether public

during the second investigative audit in January 2001 that constitutes the speech that gave rise to Long's alleged harassment. While Long and Easter argue Zollner alleges it was after the first audit in 2000 that Zollner's complaints date back to, that is not the case. Zollner specifically states in her complaint that it was at the second audit in January 2001, "at which time Sheryl Zollner provided additional information concerning what she considered violations of state law and University of Illinois policies by her immediate supervisor, Karen Long." Doc. 1, p. 2. Prior to that, Zollner does not make specific allegations that she made any complaints regarding Long that resulted in harassment.

Zollner's first allegation of harassment occurred right around the time of the second audits. In January 2001, Long refused to approve Zollner's sick leave as she did not get pre-approval for it. Then in March 2001, Long started changing Zollner's reporting patterns. These actions were taken within enough time of the audit for the court to find an inference that the actions were related to Zollner's comments. *Cf. Kelly v. Municipal Courts of Marion County, Ind.*, **97 F.3d 902 (7th Cir. 1996).** Further, as stated previously, after a plaintiff in a First Amendment retaliation claim proves that the defendant's actions were substantially motivated by the plaintiff's constitutionally protected speech, the defendant has an opportunity to establish that it would have taken the same action in the absence of the plaintiff's exercise of his rights under the First Amendment. *See Sullivan v. Ramirez*, **360 F.3d 692, 697 (7th Cir. 2004);** *Kokkinis v. Ivkovich*, **185 F.3d 840, 843 (7th Cir. 1999).** However, Long and Easter do not attempt to establish that they would have taken the same actions in the absence of Zollner's exercise of her rights under the First

---

officials are operating the government ethically and legally is a quintessential issue of public concern." *Greer v. Amesqua*, **212 F.3d 358, 371 (7th Cir. 2000).**

Amendment in their motion for summary judgment.  Therefore, the timing of the harassment to the audits is enough for this Court to find that a question of fact exists as to whether or not Zollner's speech was substantial or motivating factor in Long's alleged retaliatory actions so as to survive summary judgment.  *Cf. Vukadinovich v. Board of School Trustees of North Newton School Corp.*, 278 F.3d 693 (7th Cir. 2002); *see also Wood v. Cottey*, 2004 WL 3315376 (S.D. Ind. 2004).

## Conclusion

The Court hereby **GRANTS** *in part* and **DENIES** *in part* Defendants' motion for summary judgment (Doc. 14). The motion is *granted* in that the Court grants summary judgment in favor of Defendant Easter and against Plaintiff Zollner as to Count One.  The motion is *denied* in that the Court denies summary judgment as to Count One against Defendant Long.  Therefore, all that remains of Plaintiff Zollner's complaint is her claims in Count One against Defendant Long.

**IT IS SO ORDERED.**

**DATED this 12th day of May, 2005.**

                                                 **s/ Michael J. Reagan**
                                                 **MICHAEL J. REAGAN**
                                                 **United States District Judge**